UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
02 JAN 14 PM 4:21
N.D. OF ALABAMA

| | |
|---|---|
| ANIVISION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. CV-01-S-2927-NE |
| ) | |
| INFORGRAMES INTERACTIVE, INC., ) | |
| ) | |
| Defendant. ) | |

ENTERED

JAN 15 2002

## MEMORANDUM OPINION

This action is before the court on defendant's motion to transfer venue to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1404(a). Upon consideration of the pleadings, briefs, testimony offered during an evidentiary hearing on January 3, 2002, and oral arguments of counsel, the court concludes that defendant's motion is due to be granted.

### I. STATEMENT OF FACTS

Plaintiff, AniVision, Inc., is a corporation organized under the laws of the State of Alabama, with its principal place of business in Huntsville, Alabama.[1] Defendant, Inforgrames Interactive, Inc., is a corporation organized under the laws of the State of Delaware, with its principal place of business in Beverly, Massachusetts.[2] Plaintiff entered into a so-called "NASCAR Challenge, Development and Distribution Agreement" ("the contract") with defendant in July of 2001.[3] The parties agreed that defendant would publish — and that plaintiff would develop, market, and distribute — an interactive video game over the Internet.[4] AniVision President Brian Mitchell ("Mitchell") described the game as follows:

---

[1] *See* Motion to Transfer, Ex. A (Contract).
[2] *See id.*
[3] *See* Notice of Removal, Ex. (Complaint).
[4] Plaintiff's Brief Opposing Transfer (doc. no. 6), at 1.

> What the product did is it allowed us to take censor information off of real NASCAR vehicles, timing and scoring information each time they went around the track. Specifically, that information came from the track and was sent to our offices in Huntsville, Alabama, in real time during a race.
>
> We took that position data basically of where they were on the track, used it to recreate fairly accurate racing lines for each of the cars that could be played by a computer game. And in addition to playing the position of the real cars on the track, which reflected the real race, it added an additional car that a consumer could drive to have the sensation of competing and driving in a real NASCAR race that he saw just a few minutes earlier on TV.[5]

Inforgrames granted AniVision a royalty-bearing license for two years and the right to use Inforgrames's licensed properties and trademarks in order for AniVision to create licensed products, and to modify, improve, and repair existing games.[6]

The parties included a choice of law and forum selection clause in the contract. Section 18.6 specifies that the contract is governed by Massachusetts law, along with the parties' "irrevocable consent[] to the jurisdiction in the state and federal courts of the Commonwealth of Massachusetts." In full text, that section reads as follows:

> 18.6 This Agreement shall be governed by and construed under the laws of the Commonwealth of Massachusetts. U.S.A., excluding any conflict of laws, or other similar provision thereof, that would cause the laws of any other jurisdiction to apply, and each of the parties irrevocably consents to jurisdiction in the state and federal courts of the Commonwealth of Massachusetts over any dispute regarding the provisions of this Agreement *and waives any objection as to the venue or forum of such courts.*[7]

Following a dispute as to whether AniVision was required to pay certain sums due under the contract, Inforgrames terminated the contract on September 25, 2001, pursuant to Section 14.3 thereof, providing that "Inforgrames may terminate this Agreement immediately ... if Anivision materially breaches this Agreement and fails to cure such breach within thirty (30) days after notice

---

[5] Transcript of Jan. 3, 2002 hearing, at 49-50.

[6] *See* Brief in Support of Argument (doc. no.6)., at 1.

[7] Motion to Transfer, Ex. A (contract), at 18.6 (emphasis supplied).

2

thereof."[8] In response, AniVision filed suit in the Circuit Court for Madison County, Alabama, on October 18, 2001, alleging that Inforgrames had breached the contract ("the Alabama action").[9]

Inforgrames filed its own action for breach of contract in the United States District Court for the District of Massachusetts approximately one month later, on November 16, 2001, styled *Inforgrames Interactive, Inc. v. Anivision, Inc.*, Civil Action No. 01-11994PBS ("the Massachusetts action"). Inforgrames simultaneously removed the Alabama action to this court, and filed the present motion to transfer on November 26, 2001.[10] AniVision responded on December 12, 2001, with a motion to stay or enjoin defendant from prosecuting the Massachusetts action because: the issues raised in both actions are identical; the Alabama action was filed first; and, the factors implicated in a § 1404(a) analysis weigh against transfer.[11]

## II. DISCUSSION

A district court may, in its discretion, transfer a civil action to any other district in which it might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). The court must first determine, however, whether the action could have been brought in the proposed transferee forum. *See id.*; *see also Johnston v. Foster-Wheeler Constructors, Inc.*, 158 F.R.D. 496, 503-04 (M.D. Ala. 1994).

Jurisdiction in this case has been founded in the parties' diversity of citizenship. *See* 28 U.S.C. § 1332(a)(1) (1994). Accordingly, 28 U.S.C. § 1391(a) will permit venue in the District of Massachusetts if a "substantial part of the events or omissions giving rise to the claim" occurred in that jurisdiction.[12] The subject contract was executed by defendant at its principal place of business

---

[8] *See* Defendant Inforgrames Interactive, Inc.'s Opposition (doc. no. 12), at 3.

[9] *See* Notice of Removal filed November 16, 2001, Ex. (Complaint), at Count I.

[10] *See* Motion to Transfer (doc. no. 4).

[11] Motion to Stay or Enjoin (doc. no. 7).

[12] Venue in a diversity action is determined in accordance with 28 U.S.C. § 1391(a), which provides:

3

in Beverly, Massachusetts. Amendments to the contract allegedly were made by defendant from its offices in Massachusetts. AniVision's employees traveled to Massachusetts in an effort to perform under the contract.[13] Thus, venue would be proper in the District of Massachusetts.

Although federal courts generally defer to a plaintiff's choice of forum, *see In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S. Ct. 839, 843, 91 L.Ed. 1055 (1947)), courts nonetheless have broad discretion to transfer, and will do so if the movant can show that a plaintiff's choice of forum is clearly outweighed by other considerations. *See In re Ricoh*, 870 F.2d at 573; *Weber v. Coney*, 642 F.2d 91, 93 (5th Cir. 1981);[14] *Gould v. National Life Insurance Co.*, 990 F. Supp. 1354, 1357 (M.D. Ala. 1998). Ordinarily, the most important of these considerations is the convenience of witnesses. *See* 28 U.S.C. § 1404(a); *Blue Tee Corp. v. Mid American Drilling Equipment*, 177 F.R.D. 673, 679 (M.D. Ala. 1998); *Insuracorp, Inc. v. American Fidelity Assurance Co.*, 914 F. Supp. 504, 506 (M.D. Ala. 1996). Other relevant factors include

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gulf Oil Corp.*, 330 U.S. at 508, 67 S.Ct. at 843; *see also, e.g., Folkes v. Haley*, 64 F. Supp. 2d 1152,

---

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

[13] Response to Defendant Inforgrames Interactive's Motion (doc. no. 6), (Affidavit of Brian Mitchell), at 2-3.

[14] Decisions of the former Fifth Circuit rendered prior to the close of business on October 1, 1981 constitute binding authority in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

4

1155 (M.D. Ala. 1999); *Blue Tee Corp.*, 177 F.R.D. at 679; *Gould*, 990 F. Supp. at 1357-58; *Johnston*, 158 F.R.D. at 504.

Another consideration, and one implicated here, is the presence of a forum selection clause in the contract that forms the basis of the parties' dispute. Forum selection clauses require federal courts to modify their § 1404 analysis. Whereas, in the typical § 1404 transfer motion "the burden is on the movant to establish that the suggested forum is more convenient," when "the parties have entered into a contract containing a valid, reasonable choice of forum provision, the burden of persuasion is altered." *In re Ricoh*, 870 F.2d at 573 (emphasis supplied). Consequently, in the event of a contract dispute in which the parties have consented to a forum-selection provision, as here, courts are less inclined to submit to a plaintiff's choice of forum, because plaintiffs are not permitted to evade their contractual duties by choosing a forum different from the one specified in the written agreement. *See id.* Indeed, when a forum-selection clause is at issue, the Supreme Court has suggested that the clause generally will outweigh other § 1404(a) factors. *See Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). The Eleventh Circuit has gone a step farther, apparently making the forum-selection clause the controlling factor in the § 1404(a) analysis. *See In re Ricoh*, 870 F.2d at 573 ("Thus, while other factors might 'conceivably' militate against a transfer, ... the clear import of the [Supreme] Court's opinion [in *Stewart Organization*, 487 U.S. at 22, 108 S.Ct. at 2239] is that the venue mandated by a choice of forum clause *rarely will be outweighed* by other 1404(a) factors.") (emphasis supplied).

When a forum selection clause is at issue then, this court's analysis focuses on the convenience of the forum delineated in the parties' forum selection clause, and the "fairness of transfer, in light of the forum-selection clause and the parties' relative bargaining power." *Stewart Organization*, 487 U.S. at 29, 108 S.Ct. at 2244. In assessing the "interests of justice," per §

1404(a), this court must balance the convenience of the witnesses, along with "those public interest factors of systemic integrity and fairness." *Id.* at 30, 108 S.Ct at 2244.

This rule is not iron-clad: A party opposing a forum-selection clause can persuade the court that the contracted-for forum is "sufficiently inconvenient" to justify retention of the dispute. *In re Ricoh*, 870 F.2d at 570, 573 (determining in a case on similar facts that the plaintiff Alabama corporation had failed to demonstrate that the New York forum agreed upon in the parties' contract was "sufficiently inconvenient" to require the Alabama district court to retain the action).

The Eleventh Circuit has identified specific factors for this court to consider in assessing whether AniVision has demonstrated that the agreed-upon forum of Massachusetts is "sufficiently inconvenient" to warrant retention of the action by this court. *See id.* at 573-74. Following that analysis, it is significant, first, that the parties here "freely and fairly" entered into the written contract, following negotiations by "experienced business professionals." *See id.* at 573. AniVision's president, Brian Mitchell, and chief executive officer, Bobby Wells, among others, conducted negotiations "for several months consisting of AniVision going to Los Angeles, New York, Illinois and other places besides Massachusetts to talk with representatives of Inforgrames's parent company concerning the Contract."[15] Mitchell had been president of AniVision since October of 1999, and had engaged in negotiations with various other companies to market AniVision's technology.[16] Mitchell had executed licensing agreements on behalf of AniVision with the Indy Racing League and the Southeastern College Football Conference, and also had negotiated letters of intent with the National Hockey League and the World Wrestling Federation.[17] Finally, it was defendant's senior vice president and general manager, John Hurlbut, who signed the contract

---

[15] Response to Defendant Inforgrames Interactive's Motion (doc. no. 6) (Affidavit of Brian Mitchell), at 2.
[16] *See* Transcript of Hearing, Jan. 3, 2002, at 56.
[17] *See id.*

6

with Inforgrames on defendant's behalf following negotiations, thereby making the contract effective as of July 16, 2001.[18] *See id.*

Second, the parties' consent to jurisdiction and venue in the state and federal courts of Massachusetts is reasonable in light of the fact that Inforgrames has its principal place of business in Beverly, Massachusetts. *See id.* In addition, AniVision's employees have traveled to Massachusetts to meet with Inforgrames's employees in executing the contract.[19]

Third, AniVision has not demonstrated that the contract was induced by "fraud, duress, misrepresentation, or other misconduct that would bar the clause's enforcement." *Id.* at 573-74. While AniVision does allege that Inforgrames committed fraud when it "illegally terminated" the contract,[20] these assertions of fraud do not go to the matter of the contract's execution, or, more specifically, to the parties' consent to the forum-selection clause itself. The court's analysis as to this third factor might have ended there, but testimony given by Mitchell at the January 3rd hearing requires this court to consider whether AniVision, acting through Mitchell, was fraudulently induced to execute the contract with Inforgrames.[21]

The contract requires AniVision to make two advance payments to Inforgrames: a $200,000 payment due upon execution of the agreement, and an additional $175,000 payment due upon the release of what the contract terms "The Enhanced Game."[22] Mitchell testified at the January 3rd hearing that he was reluctant to sign a contract that included such advance payment provisions, because Inforgrames "could possibly not be able to deliver [the trademarks on the NASCAR] drivers

---

[18] *See* Motion to Transfer, Ex. A (Contract), at 14. The court notes that there is no date accompanying Hurlbut's signature, but that the first paragraph of the contract cites July 16, 2001 as its effective date. *See id.*

[19] *See id.* at 3.

[20] *See* Notice of Removal, Ex. 1 (Complaint).

[21] *See* Second Memorandum Brief of AniVision, Inc. at 3; *see also* Notice of Removal, Ex. 1 (Complaint), ¶¶ 5-6.

[22] *See* Motion to Transfer, Ex. A (Contract), § 3.1.

and tracks, and we would still owe them three hundred and seventy-five thousand dollars."[23]

Once he received the contract for signature and read the terms of the advance compensation provision, Mitchell telephoned Inforgrames executive Jon Leach, who was the "point of contact" on the contract,[24] to

> suggest[] again that the contract be modified to allow [Inforgrames] to deliver [AniVision] most of the [trademarks on the NASCAR] drivers, some reasonable number of drivers. We would pay them part of the money at that time. When they delivered all of the drivers and tracks that were required, we would pay them the rest of the monies at that time."[25]

According to Mitchell, "[a]t that time, John [sic] told me, he said, 'Well, we'll just do this. We just won't ask you to pay any money until we get those marks delivered.'"[26] Mitchell replied that he wanted Leach's offer in writing, but admitted that Mitchell and Leach had agreed that they did not want to incur delays while the contract department at Inforgrames approved the new arrangement.[27] Mitchell considered the new arrangement after the telephone call ended, and discussed the proposal with AniVision's chief executive officer, Bobby Wells.[28] Both felt the proposal to be reasonable, but still wanted the arrangement to be memorialized in writing.[29] According to Mitchell:

> I immediately documented the conversation in e-mail. I faxed it back to Jon [Leach], e-mailed it to Jon and left a voice mail for Jon. I made my very best efforts to communicate again the proposal that he made to me and the fact that we were going to accept it and sign the contract as a condition of that proposal.
>
> ...
>
> What I did next is I believe I waited for some reply from Jon. I e-mailed him. Jon

---

[23] *See* Transcript of Hearing, Jan. 3, 2002, at 45.
[24] *Id.* at 44.
[25] *Id.* at 45.
[26] *Id.*
[27] *Id.*
[28] *Id.* at 46.
[29] *Id.*

8

      e-mailed back about a day later and said, "Sign the contract, sign the contract. It's good to go."[30]

Mitchell submitted as evidence a copy of both e-mails to which he referred in his January 3, 2002 testimony. In the first, dated July 19, 2001, Mitchell writes to Leach: "Jon, per our conversation this morning, I will execute the contract based on your statement that you will not require AniVision to make the initial payment of $200,000 until such time that Inforgrames authorizes a soft launch of the NASCAR Challenge with the required drivers and tracks."[31] On July 23, 2001, Mitchell sent Leach another e-mail, this time asking: "Jon, I did not hear back from you on Friday regarding the signing of our contract. What is the status?"[32] Mitchell's July 23, 2001 e-mail made no mention of Leach's offer to permit AniVision to forego its advance payments to Inforgrames. Leach replied: "Brian, sign the contract, overnight all three copies to me and we will execute on our end and send back a version for you[r] files."[33] Mitchell testified that, at that point, AniVision executed the contract and sent it to Inforgrames, but without enclosing the $200,000 payment due upon execution.[34]

      The court requested the parties to submit briefs following the January 3, 2002 hearing, addressing whether the foregoing circumstances would enable AniVision to maintain that it was fraudulently induced to execute the contract in reliance on Jon Leach's statement, "We just won't ask you to pay any money until we get these marks delivered." AniVision has argued to the court that:

> Fraud in the inducement is clear under the circumstances of this case and it is also clear that the perpetrator of the fraud used the misrepresentations to get AniVision

---

[30] *Id.*

[31] Response to Defendant's Motion (doc. no. 6), (Mitchell affidavit), Ex. (e-mail dated July 19, 2001).

[32] *Id.*, Ex. (e-mail dated July 23, 2001).

[33] *Id.*

[34] *See* Transcript of Hearing, Jan. 3, 2002, at 46.

9

to execute the Contract in question *containing the choice of forum clause* which AniVision and the Defendant both knew were in the Contract and which was one of the provisions that the Defendant had represented would not be taken out of the Contract.[35]

Despite this contention, the court is persuaded by Inforgrames's arguments to the contrary. Under Alabama law,

> [t]he elements of actionable fraud based upon a misrepresentation are: 1) a duty to speak the truth; 2) a false representation of a material existing fact made intentionally, recklessly, or innocently; 3) action upon the false representation by the plaintiff; and 4) loss, harm, or damage proximately resulting from the false representation.

*Kidder v. AmSouth Bank, N.A.*, 639 So.2d 1361, 1362 (Ala. 1994). The Supreme Court of Alabama has clarified that a plaintiff must have reasonably relied on the allegedly false oral statements that caused it to execute the contract. *See Foremost Insurance Co. v. Parham*, 693 So. 2d 409, 417 (Ala. 1997). Or, as the Eleventh Circuit explained: "We must determine whether [plaintiff's] reliance on oral representations made prior to [its] executing a contract containing statements inconsistent with the oral representations was [unreasonable] as a matter of law." *McGriff v. Minnesota Mutual Life Insurance Co.*, 127 F.3d 1410, 1414 (11th Cir. 1997).

The court finds that AniVision's reliance on Leach's oral representation that Inforgrames would forego the payments due upon and following execution of the contract was unreasonable as a matter of Alabama law. The Alabama Supreme Court has stated quite clearly that

> *fraud or misrepresentation cannot be predicated upon a verbal statement made before execution of a written contract when a provision in that contract contradicts the verbal statement.* ... If a party has reason to doubt the truth of an oral representation or is informed of the truth before he acts, he may not reasonably act or rely on that representation.

*Tyler v. Equitable Life Assurance Society of the United States*, 512 So. 2d 55, 57 (Ala. 1987)

---

[35] Second Memorandum Brief of AniVision at 3 (emphasis supplied).

(emphasis supplied) (citing *Taylor v. Moorman Manufacturing Co.*, 475 So. 2d 1187 (Ala. 1985); *see also McGriff*, 127 F.3d at 1414-15 ("[The] Alabama Supreme Court [has] reaffirmed the general rule that 'as a matter of law, a person with the ability to read and to understand the nature of the transaction cannot act on an oral representation when that representation is followed by an executed document that contradicts it.'") (interpreting Alabama law and quoting *Alfa Mutual Life Insurance Co. v. Northington*, 561 So. 2d 1041, 1046 (Ala. 1990), and citing *Ramsay Health Care, Inc. v. Follmer*, 560 So. 2d 746, 749 (Ala. 1990)).

As in *Tyler*, AniVision was entitled to examine the contract prior to its execution; the language of the contract should have given AniVision reason to doubt Leach's oral representation that it could forego the payments due Inforgrames upon execution of the contract, because the contract specified that those payments would in fact be due upon execution. *See Tyler*, 512 So. 2d at 57. Mitchell knew that the written contract did not include Leach's oral representations offered by Leach: Mitchell, in fact, testified that, while he could have pressed Inforgrames to include language in the contract to the effect that AniVision did not have to pay the advances upon the contract's execution, he *simply did not want to incur a delay* while Inforgrames's contract department approved the new contract language.[36]

Further, the language of the contract executed by the parties was clear and unambiguous. The parties executing the contract were sophisticated; AniVision's executives had significant experience in contracting with other companies about the same technology it planned to share with Inforgrames.[37] *See In re Ricoh*, 870 F.2d at 573. According to the Alabama Supreme Court, "as a matter of law, a person with the ability to read and to understand the nature of the transaction cannot

---

[36] *See* Transcript of Hearing, Jan. 3, 2002, at 45.

[37] *See supra* text accompanying note 17.

11

act on an oral representation when that representation is followed by an executed document that contradicts it." *Alfa Mutual Insurance Co.*, 561 So. 2d at 1046. In light of these facts, the court finds that AniVision's reliance on Leach's oral representations to forego AniVision's advance payments was unreasonable, and thus insufficient to demonstrate that AniVision was fraudulently induced to execute the contract (including the forum selection clause) with Inforgrames.

The final *In re Ricoh* factor requires a plaintiff to allege that, "because of intervening and unexpected occurrences between the contract's formation and the filing of the suit, the contract's purpose would be frustrated" if the case were transferred to the District of Massachusetts. *See id.* at 574. AniVision has not made this showing. While AniVision does assert that "the financial net worth of AniVision has been severely affected by the breach of the Contact [sic] by Inforgrames," and that it "may not be able to defend the case if required to go to Massachusetts because of financial considerations," the mere contingency asserted is not enough to require this court to ignore the bargained-for and consented-to forum selection clause agreed upon by the parties.[38] In *Stewart Organization v. Ricoh Corp.*, Justice Kennedy, writing in concurrence, imagined that a court should decline to enforce a forum-selection clause only in "all but the *most exceptional* cases." 487 U.S. at ___, 108 S.Ct. at 2246 (Kennedy, J., concurring) (emphasis supplied); *see also In re Ricoh*, 870 F.2d at 573 n.6. As in *In re Ricoh*, AniVision's arguments do not "present the type of 'exceptional' situation in which judicial enforcement of a contractual choice of forum clause would be improper." *In re Ricoh*, 870 F.2d at 574. AniVision has not demonstrated, thus, that the District of Massachusetts is "sufficiently inconvenient" to prevent the transfer of this action. *See id* at 573.

AniVision nonetheless asserts that it was the first to file its action, and thus that this court

---

[38] *See* Brief in Support of Argument (doc. no.6), at 4-5.

12

should retain jurisdiction over the Alabama action.[39] Relying on the Supreme Court's decision in *Rickey Land & Cattle Co. v. Miller & Lux*, 218 U.S. 258, 262, 31 S.Ct. 11, 13, 54 L.Ed. 1032 (1910), the former Fifth Circuit explained the so-called "first-to-file" rule: When "confronted with two suits overlapping at their substantive issues," courts will have "concurrent jurisdiction ..., and ... the court first seized should proceed ... without interference." *Mann Manufacturing, Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 n.6 (5th Cir. 1971) (quoting *Rickey Land & Cattle Co.*, 218 U.S. at 262, 31 S.Ct. at 13); *see also Martin v. South Carolina Bank*, 811 F.Supp. 679, 686 (M.D. Ga. 1992) ("[W]here two courts have concurrent jurisdiction over substantially similar actions, the first court in which jurisdiction attaches has priority to consider the case.") (citing *Ven-Fuel, Inc. v. Department of Treasury*, 673 F.2d 1194, 1195 (11th Cir. 1982)); *see also Merrill Lynch Fenner & Smith, Inc. v. Haydu*, 675 F.2d 1169, 1173 (11th Cir. 1982) ("[W]hen separate courts are faced with the same lawsuit ... one court must yield its jurisdiction to the other, unless one court has exclusive jurisdiction over a portion of the subject matter in dispute.").

As a preliminary matter, the Alabama and Massachusetts actions clearly overlap on their substantive issues: both center on alleged breaches of the parties' contract.[40]

Although AniVision argues strenuously that it filed its action in the Madison County Circuit Court on October 18, 2001, and thus that it filed its action before Inforgrames's Massachusetts action, this court looks *not* to the order in which the complaints were *filed*, but rather to the chronological order in which *jurisdiction attaches in the competing courts*. *See Mann Manufacturing, Inc.*, 439 F.2d at 408 n.6 (5th Cir. 1971) (quoting *Rickey Land & Cattle Co.*, 218 U.S. at 262, 31 S.Ct. at 13); *see also Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 625 (9th

---

[39] *See id.* at 6.

[40] *See* Motion to Transfer, Ex. 1 (Massachusetts action complaint); Notice of Removal, Ex. 1 (Complaint).

Cir. 1991); *Allstate Insurance Co. v. Clohessy*, 9 F. Supp. 2d 1314, (M.D. Fla. 1998) (stating that the first-to-file rule "holds that when parties have instituted competing or parallel litigation in separate courts, the court *initially having jurisdiction* should hear the case.") (emphasis supplied) (citing *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir. 1993)); *Luckie v. Smith, Barney, Harris Upham & Co.*, 766 F. Supp. 1116, 1117 (M.D. Fla. 1991) ("In the absence of compelling circumstances, the court *initially seized of a controversy* should be the one to decide the case.") (emphasis supplied).

As a technical matter, this court did not obtain jurisdiction over the Alabama action until 3:43 p.m. Central Standard Time on November 16, 2001,[41] while the District of Massachusetts obtained jurisdiction over the Massachusetts action at 2:00 p.m. Eastern Standard Time.[42] While this court's jurisdiction attached only hours after that of the District of Massachusetts, the fact remains that Inforgrames was the first to file its action *in the competing court*.

Even so, this court is inclined to avoid making its ruling on the difference of mere hours. In doing so, the court follows the lead of other district courts that have determined that

> [t]he first to file rule "is usually disregarded where the competing suits were filed merely days apart." *Ontel Products*, Inc. v. Project Strategies Corp., 899 F. Supp. 1144, 1153 (S.D.N.Y. 1995). Where "the difference in time of filing is so close, it is fair to treat the competing actions as contemporaneously filed." *Azurix Corp. Inc. v. Syngaro Technologies, Inc.*, No. C.A. 17509, 2000 WL 193117, at *3 (Del. Ch. Feb. 3, 2000) (one action filed on Friday and another filed on Monday).

*Southern Union Co. v. Southwest Gas Corp.*, 165 F. Supp. 2d 1010, 1045 (D. Ariz. 2001). The court is mindful of the Ninth Circuit's statement that, "[t]he most basic aspect of the first-to-file rule is that it is discretionary; 'an ample degree of discretion, appropriate for disciplined and experienced judges must be left to the lower courts.'" *Alltrade*, 946 F.2d at 628 (quoting *Kerotest Mfg. Co. v.*

---

[41] *See* Notice of Removal (doc. no. 1).

[42] *See* Defendant Inforgrames Interactive, Inc.'s Opposition (doc. no. 12), at 11 n.11.

*C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183-84, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)); *see also Weber v. Coney*, 642 F. 2d 91, 93 (5th Cir. 1981) (noting district court's discretion in deciding whether to transfer an action). Further, other federal courts (including district courts within this Circuit) have acknowledged that the first-to-file rule should not be applied mechanically or rigidly. *See, e.g., Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Associates, Inc.*, Fed. Appx. 433, 437 (6th Cir. 2001); *Alltrade, Inc.*, 946 F.2d at 628; *Tempco Electric Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746, 749-50 (7th Cir. 1987); *see also Martin*, 811 F. Supp. at 686; *Luckie*, 766 F. Supp. at 1117 n.1. Consequently, the court concludes that the Massachusetts action and the Alabama action arrived in their competing federal courts contemporaneously, and, thus, that the first-to-file rule should not be applied under these circumstances. *See Southern Union Co.*, 165 F. Supp. 2d at 1045 (citing *Azuriz Corp.*, No. C.A. 17509, 2000 WL 193117, at *3).

Accordingly, defendant's motion to transfer venue shall be granted, and this action transferred to the United States District Court for the District of Massachusetts for all further proceedings. An appropriate order will be entered contemporaneously herewith.

DONE this 14th day of January, 2002.

_____
United States District Judge